# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**TARAN JAMES,**

      Plaintiff,

      **v.**                     **Case No. 15-CV-1460**

**JAMES ZANON,** *et al.*,

      Defendants.

---

## DECISION AND ORDER

---

Plaintiff Taran James, a Wisconsin state prisoner who is representing himself, filed a civil rights action under 42 U.S.C. § 1983, alleging that defendants violated his Fourteenth Amendment rights at the Oshkosh Correctional Institution. On August 9, 2016, the Court screened the complaint and allowed Mr. James to proceed with two procedural due process claims: (1) Defendants James Zannon, Stan Doman, and Kathy Sabel denied Mr. James's request to see full statements from four confidential informants, and (2) Defendant Mark Weisgerber denied Mr. James's request for three additional inmate witnesses for his disciplinary hearing. (ECF No. 34 at 9 and 11).

This matter comes before the Court on cross-motions for summary judgment. (ECF Nos. 42 and 58). For the reasons discussed below, the Court will grant defendants' motion for summary judgment and will dismiss the case.

## FACTS[1]

At the time relevant to this matter, Mr. James was an inmate at Oshkosh Correctional Institution ("Oshkosh"). (ECF No. 77, ¶ 1.) Defendants were employees at Oshkosh: James Zanon was Captain in the Segregation Unit (*id.*, ¶ 2); Stan Doman was Lieutenant in the Segregation Unit (*id.*, ¶ 3); Kathy Sabel was Unit Supervisor (*id.*, ¶ 4); and Mark Weisberger was Security Director (*id.*, ¶ 5).

On July 22, 2013, Mr. James received Conduct Report #2347074 for "inciting a riot." (*Id.*, ¶¶ 6-7; *see also* ECF No. 55-1). According to the conduct report, Mr. James allegedly participated in an anonymous letter to the Warden, which stated that "actions will be taken by all inmates in the 'very near' future which will cause for the lockdown of this institution." (ECF No. 77, ¶7; *see also* ECF No. 56-2 at 1). The letter notified the Warden that correctional staff often failed to follow "DAI policy" on disciplinary matters and failure to remedy the problem "will receive an aggressive response." (ECF No. 56-2 at 1). The letter also stated that inmates "will not comply with any work, schooling, or programing" until there was a solution. (*Id.* at 3)

Along with the conduct report, Mr. James received a document entitled "Notice of Major Disciplinary Hearing Rights." (ECF No. 77, ¶ 8). The document

---

[1] The facts in this section are taken from the parties' replies to the Proposed Findings of Fact (ECF Nos. 77 and 81), and the plaintiff's sworn amended complaint (ECF No. 35), which the Court must construe as an affidavit at summary judgment. *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996). Where the parties object to proposed finding of facts without citation to evidentiary material, those facts are deemed admitted for the purpose of deciding summary judgment. Civ. L. R. 56(b)(2)(B)(i) and (b)(4).

explained that Mr. James could request two eye-witnesses and a staff member witness at his disciplinary hearing. (*Id.*) It also explained that Mr. James would need "good cause" to call more than two eye-witnesses. (*Id.*)

Mr. James timely requested inmates Milton Brown and David Gatlin as eye-witnesses and Unit Manager Chris Kuchinski as character witness. (*Id.*, ¶ 9; *see also* ECF No. 55-1 at 7). Mr. Doman approved the inmate witnesses but denied the request for Unit Manager Kuchinski, concluding that his testimony would be irrelevant to the issue in the conduct report. (*Id.*, ¶ 12; *see also* ECF No. 55-1 at 7).

According to Mr. James, he then sent a letter to his staff advocate, Neyhard, and to Mr. Weisgerber requesting three more inmate witnesses for his disciplinary hearing: Michael Shelton, Cortez Kennedy, and Darwin McKnight. (ECF No. 81, ¶¶ 1-2). Inmate Shelton "would have admitted sending the letter to the Warden;" inmate Kennedy "would have admitted to previously being found guilty of the same letter being sent to the Warden;" and inmate McKnight "would have corroborated the fact that Mr. James had no part or motive to be involved." (*See* ECF No. 74 at 11).

According to Mr. Weisgerber, he never received any letters requesting additional witnesses, and even if he had, he would have directed the requests to the segregation supervisor who was responsible for reviewing witness requests. (ECF No. 77, ¶¶ 10-11, 15, 18-19). To the best of Mr. Weisgerber's knowledge, no circumstances existed that would have warranted adding witnesses beyond the allotted two. (*Id.*, ¶ 20).

On August 6, 2013, Mr. Zanon, Ms. Sabel, and Mr. Doman ("the Committee")
held the disciplinary hearing for Conduct Report #2347074.[2] (*Id.*, ¶ 25). The
Committee reviewed the following evidence: (a) the conduct report (*see* ECF No. 55-
1 at 1-3), (b) the anonymous letter sent to the Warden (*see* ECF No. 56-2), (c) four
confidential informant statements (*see* ECF No. 28; *see also* ECF No. 55-1 at 8), (d) a
written statement by Mr. James (*see* ECF No. 55-1 at 15-17), and (e) testimony from
inmate Gatlin and inmate Brown denying Mr. James's involvement in the incident
(*id.* at 5). (*Id.*, ¶ 28).

With regard to the four confidential informant statements, Mr. Zanon
believed that the physical safety of the informants would be jeopardized if their
identities were released. (*Id.*, ¶ 38). According to Mr. James's complaint, the
"Gangster Disciples" may have been involved in the non-work sit down. (ECF No. 35
at 17, ¶ 13). Mr. Weisgerber explained that there was no way to redact the
confidential informant statements in a way to ensure that Mr. James would not be
able to identify those individuals. (ECF No. 27, ¶ 4). Thus, Mr. James received a
copy of DOC-78A "Summary of Confidential Informant Statements," a document
used to summarize information from a confidential informant without revealing the
informant's identity. (ECF No. 77, ¶ 39).

The summary of the confidential informant statements indicated that
informants #1 and #3 implicated Mr. James and inmate Brown in the letter to the
Warden. (ECF No. 55-1 at 8; *see also* ECF No. 28). Informants #2 and #4 implicated

---

[2] Mr. Zanon, Ms. Sabel, and Mr. Doman were not involved in the initial
investigation leading up to the conduct report. (ECF No. 77, ¶ 26).

Mr. James, inmate Brown, and inmate Gatlin in the letter to the warden. (*Id.*) Earlier in the litigation, the Court conducted an *in camera* review of the confidential informant statements and agreed that defendants' need to maintain prison security was greater than Mr. James's need to possess the statements. (ECF No. 34 at 2-3.) It also noted that the summaries were an accurate reflection of what the confidential informants had stated. (*Id.*)

With regard to Mr. James's written statement, he argued that the institution could not "prove guilt by a preponderance of the evidence." (ECF No. 55-1 at 15-17). He explained that inmates Shelton, McKnight, and Kennedy were all accused of the same crime, yet the confidential informant statements did not mention any of their names. (*Id.* at 16 ). Mr. James also explained that there was no handwriting sample or DNA to prove his participation in the letter. (*Id.* at 17.)

Mr. James then made an oral statement at the disciplinary hearing denying his involvement in the letter and reiterating the arguments from his written statement. (ECF No. 77, ¶¶ 27-29). According to Mr. James, he asked to call inmates Shelton, McKnight, and Kennedy as witnesses but the committee denied the request. (*Id.*, ¶ 30). According to defendants, Mr. James never made an oral request for additional witnesses, and if he had, there would have been a notation on the record showing that they denied the request. (*Id.*, ¶ 33).

The Committee found Mr. James guilty of inciting a riot. (*Id.*, ¶ 41). It noted that Mr. James argued technicalities about the evidence, *i.e.*, that there was no DNA evidence or handwriting samples to prove his involvement, rather than

generally denying guilt or providing alternative facts. (ECF No. 55-1 at 4). Further, the allegations in the confidential informant statements were "quite specific" as to the inmate involved and the steps that inmate took to organize the work stoppage. (*Id.* at 4-5). Mr. Zanon stated that the statements were taken "independently of one another" and "corroborated each other." (ECF No. 77, ¶ 40). The Committee noted that Mr. James's two witnesses (inmate Brown and inmate Gatlin) were identified as co-conspirators, and thus their testimonies at the disciplinary hearing were less credible. (ECF No. 55-1 at 4). The warning letter to the Warden also threatened an "aggressive response, immediately." (*Id.*) Therefore, the Committee found Mr. James guilty of inciting a riot. (*Id.*)

Mr. James received 360 days in disciplinary separation. (ECF No. 77, ¶ 42). He timely appealed the decision, and the Warden affirmed the finding of guilt. (*Id.*, ¶¶ 44-46). The Department of Corrections ("DOC") then reviewed his file for possible transfer to the Wisconsin Secure Program Facility ("WSPF"). (*Id.*, ¶ 47). Mr. James satisfied the screening criteria, and the DOC approved him for transfer to WSPF. (*Id.*, ¶ 48).

On August 6, 2013, Mr. James arrived at WSPF and was assigned to "restrictive housing." (*Id.*, ¶¶ 49-50). Restrictive housing has three steps. (*Id.*, ¶ 51). As an inmate progresses through the steps, he receives more privileges and property.[3] (*Id.*) Mr. James was on step one from August 6, 2013, to August 29, 2013;

---

[3] For example, step one inmates receive one-15 minute call per month; step two inmates receive two-15 minute calls per month; and step three inmates receive three-15 minute calls per month. (ECF No. 77, ¶ 64).

step 2 from August 30, 2013, to September 16, 2013; and step 3 from September 17, 2013, to July 30, 2014. (*Id.*, ¶ 52).

On July 30, 2014, Mr. James's status changed from "disciplinary" status to "administrative confinement" status. (*Id.*, ¶ 50). Administrative confinement status is within the "restrictive housing" unit but allows for the most privileges.[4] (*Id.*, ¶¶ 68-69). WSPF then released Mr. James to general population on December 22, 2015 where he currently resides. (*Id.*, ¶ 50)

The parties largely agree as to the conditions at WSPF. (*See* ECF No. 77, ¶¶ 51-77). Upon arrival at WSPF, each inmate receives the following items: t-shirt, pants, over shirt/long shirt, socks, underwear, canvas shoes, washcloth, towel, pillow/pillow case, mattress, sheets, blankets, and writing pens. (*Id.*, ¶ 67). The average temperature is between 68 and 72 degrees, and there is regular maintenance to fix air and heating issues. (*Id.*, ¶¶ 62-63).

Inmates have contact with prison staff on a daily basis during meal and medication pass. (*Id.*, ¶ 58). Inmates receive out-of-cell activity several times a week. (*Id.*, ¶ 53). Out-of-cell activity includes two opportunities for indoor recreation and two opportunities for outdoor recreation. (*Id.*, ¶ 55). Each opportunity is one hour and 15 minutes. (*Id.*, ¶ 56). Outdoor recreation allows for exercise, fresh air and sunshine, and socialization with other inmates. (*Id.*, ¶ 57). Indoor recreation has a pull-up bar and offers "a change of scenery." (*Id.*) Inmates are able to shower

---

[4] Privileges include electronics and a state-issued television. (*Id.*, ¶¶ 68-69.)

three times a week and receive clean clothes and clean towels on shower days. (*Id.*, ¶¶ 60-61).

Once a week, inmates receive cleaning supplies to clean their cells. (*Id.*, ¶ 59). They receive one hour of visitation per week, and one hour and 15 minutes in the law library. (*Id.*, ¶¶ 65, 71). Inmates can also make canteen purchases once a week. (*Id.*, ¶ 70). Inmates may make phone calls several times a month. (*Id.*, ¶ 64).

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The Court takes all facts, and reasonable inferences from those facts, in the light most favorable to the nonmoving party and grants summary judgment when no reasonable jury could find for the nonmoving party. *See Anderson*, 477 U.S. at 255.

## ANALYSIS

To challenge the outcome of a disciplinary hearing, a prisoner must show that: (1) his punishment implicated a liberty interest; and (2) the procedures used to deprive him of that liberty interest were constitutionally deficient. *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989); *Marion v. Columbia Corr. Inst.,* 559 F.3d 693, 697 (7th Cir. 2009); *Scruggs v. Jordan,* 485 F.3d 934, 939 (7th Cir. 2007).

Punishment implicates an inmate's liberty interest when it causes an "atypical and significant hardship." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). A prisoner's placement in disciplinary segregation, for instance, may create a liberty interest "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion,* 559 F.3d at 697–98. "Periods of [solitary] confinement that approach or exceed one year may trigger a cognizable liberty interest without any reference to conditions." *Id.*

The Seventh Circuit has held that a trial court could not dismiss an action based only on the pleadings "in a case that involved one year of segregation." *Id.* at

698. Instead, the trial court was to conduct "additional factual development" on the inmate's conditions of confinement. *Id.* The Seventh Circuit explained, "both the duration and the conditions of segregation must be considered in the due process analysis; if the conditions of segregation [are] significantly harsher than those in the normal prison environment, then a year of [segregation] might count as deprivation of liberty where a few days or even weeks might not." *Id.* (internal quotations and citation omitted).

Once a prisoner establishes that his punishment implicates a liberty interest, the Court determines whether the institution provided the prisoner with the following due process rights:

(1) advance (at least 24 hours before hearing) written notice of the claimed violation;
(2) the opportunity to be heard before an impartial decision maker;
(3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and
(4) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action.

*Rasheed-Bey v. Duckworth*, 969 F.2d 357, 361 (7th Cir. 1992); *Scruggs*, 485 F.3d at 939. Due process requirements are "flexible and variable dependent on the situation being examined." *Mendoza v. Miller*, 779 F.2d 1287, 1292 (7th Cir. 1985)(quoting *Bell v. Wolfish*, 441 U.S. 520, 560 (1979)). Prison administrators are accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolfish,* 441 U.S. at 547.

The parties dispute whether Mr. James's punishment of "360 days disciplinary separation" (most of which he served at WSPF) implicated his liberty interest. Mr. James believes that the duration of his sentence alone constituted a significant and atypical hardship. Defendants, on the other hand, believe that the duration of confinement must be coupled with harsh conditions of confinement to trigger a protected liberty interest. Defendants are correct: *Marion* mandates assessment of both duration and conditions (neither of which appear to be disputed here).

Regardless, the Court need not determine whether Mr. James's liberty interest was implicated because the procedures he received at the disciplinary hearing satisfied constitutional due process requirements.

Mr. James makes two main due process arguments regarding his disciplinary hearing: (1) he could not call inmates Shelton, Cortez, and Kennedy as witnesses for his hearing; and (2) he did not get to see the full confidential informant statements to prepare for his hearing. Instead, he only received "summaries" of the confidential informant statements.

Regarding the three additional witnesses, the Committee need not accept evidence that is "irrelevant, repetitive, or unnecessary." *Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003) (citing *Forbes v. Trigg*, 976 F.2d308, 317-18 (7th Cir. 1992)). The two witnesses called during Mr. James's disciplinary hearing (inmate Brown and inmate Gatlin) were accused of the same misconduct as him. The Committee noted their possible involvement in the incident and concluded that their

statements were less credible than those of the four confidential informants, who had no interest in the outcome of the case.

Mr. James now seeks to include inmates Shelton, Cortez, and Kennedy as witnesses for his disciplinary hearing for the very reason inmates Brown and Gatlin were deemed less credible, that these individuals were also charged with the same crime and would have "admitted" to participating in it. Mr. James fails to acknowledge that that Committee would likely have concluded, as it did with inmates Brown and Gatlin, that the statements were from co-conspirators who were less credible than the confidential informants. For the same reason, the evidence was repetitive and unnecessary, and the addition of these three witnesses would not have changed the outcome of the disciplinary hearing. *See Piggie,* 344 F.3d at 678 (noting that harmless error analysis applies to prison disciplinary proceedings). Accordingly, the exclusion of inmates Shelton, Cortez, and Kennedy from the disciplinary hearing did not violate Mr. James's right to due process

Regarding the four confidential informant statements, "[an inmate] does not have a due process right to be informed of the identity of the confidential informants." *See Mendoza v. Miller*, 779 F.2d 1287, 1294 (7th Cir. 1985). Instead, an inmate's right to confront witnesses is "necessarily circumscribed by the penological need to provide swift discipline in individual cases ... [and by the] very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff." *Id.* at 1293 (quoting *Ponte v. Real*, 471 U.S. 491 (1985)). As the Seventh Circuit has explained, "revealing the names of informants ... could lead to

the death or serious injury of some or all of the informants." *Id.* at 1293 (quoting

*McCollum v. Miller,* 695 F.2d 1044, 1048 (7th Cir. 1982)). Thus, the Court gives

"broad discretion" to prison authorities in determining whether to identify

informants by name and will affirm that discretion when supported by "some

evidence" in the record. *Id.*

Here, Mr. Zanon determined that the physical safety of the confidential

informant witnesses would be at jeopardy if their identities were released or if they

provided in-person testimony at the disciplinary hearing. Mr. Zanon's conclusion is

bolstered by Mr. James's own complaint, which notes that the "Gangster Disciples"

may have been involved in the work sit-in.

Further, Mr. Weisgerber explained that there was no way to redact the

confidential informant statements in a way to ensure that Mr. James would not be

able to identify the informants. This Court conducted an *in camera* review of the

confidential informant statements and agreed. It concluded that the defendants'

need to maintain prison security was greater that Mr. James's need to possess the

statements. *See* ECF No. 34 at 2-3. Accordingly, use of confidential informant

statements did not violate Mr. James's due process rights. *See Dawson v. Smith,*

719 F.2d 896, 899 (7th Cir. 1983)(concluding that *in camera* review of a confidential

informant statement can document the reliability of a prison informant). As a

result, the court will grant the defendants' motion for summary judgment and will

dismiss this case.

**ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED** that defendants' motion for summary judgment (ECF No. 42) is **GRANTED** and plaintiff's motion for summary judgement (ECF No. 58) is **DENIED**.

**IT IS ORDERED** this case is **DISMISSED**. The clerk of court shall enter judgment according.

This order and the judgment to follow are final. A dissatisfied party may appeal this decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. The Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may petition to alter or amend the judgment under Federal Rule of Civil Procedure 59(e) or petition for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend these deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

Dated at Milwaukee, Wisconsin, this 21st day of August, 2017.

**BY THE COURT:**

*s/ David E. Jones*
DAVID E. JONES
United States Magistrate Judge

14